BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**RYAN W. BOUNDS, OSB #00012**
Assistant United States Attorney
Ryan.Bounds@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:20-cr-00028-MO** |
| **v.** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **GINA R. CHILES,** | |
| **Defendant.** | **Sentencing: November 30, 2020, at 10:30 a.m.** |

Over the course of nearly four years, defendant Gina R. Chiles embezzled more than $1.2 million from clients of her burgeoning property-management business, Inspire Vision Property Management & Consulting (IVPMC). The victims of the fraud included the very client who helped defendant launch IVPMC eight years ago—indeed that client was the primary victim. Defendant concealed her thefts by doctoring bank statements and lying to homeowners until she had stolen so much she could no longer cover the resulting shortfalls by moving clients' money around. All of her defrauded clients feel betrayed, and they still await repayment nearly two years after she started to come clean. The abuse of trust and extent of the losses demand a

**Government's Sentencing Memorandum**                                    **Page 1**

meaningful sentence of imprisonment, notwithstanding the defendant's lack of criminal history and seemingly limited risk of recidivism.  Accordingly, the government urges the Court to sentence her to serve fifteen months in federal prison, followed by three years of supervision by probation officers, and to pay restitution totaling $1,202,751.34.

## I.       PROCEDURAL BACKGROUND AND CRIME OF CONVICTION

On New Year's Eve last year, defendant executed a plea agreement with the government in which she committed to waive indictment and to plead guilty to an information charging her with one count of wire fraud in violation of 18 U.S.C. § 1343. (ECF #13.)  Defendant pleaded guilty pursuant to that agreement before Magistrate Judge Beckerman on March 2, 2020, and this Court adopted the Findings and Recommendations urging acceptance of the plea on March 20, 2020. (ECF #16.)   Defendant has remained out of custody throughout these proceedings.

Though the proceedings themselves began in early 2020, defendant's reckoning started a year before, when she tearfully acknowledged to Victim #1 and the victim's accountant that she had "mismanaged" more than $700,000 of Victim #1's money.  That emotional (though only partial) confession resulted less from contrition, it appears, than the inevitable and imminent discovery of her crimes.  Victim #1's accountant had recently learned of a $148,792.72 construction lien on one of the properties that defendant managed for Victim #1, despite the fact that the victim had given defendant money to pay for the job months earlier.  The accountant and Victim #1 confronted defendant about the unpaid invoice and directed her to rectify the situation forthwith.  Soon thereafter (and suspecting financial mismanagement was afoot), the accountant directed defendant to distribute income from the properties she managed for Victim #1. Defendant's urgent need to cover the large shortfall on the construction payment and the looming

**Government's Sentencing Memorandum**                                          **Page 2**

distributions to Victim #1 stressed her long-running scheme of skimming and shuffling client funds to the point of collapse.

When all was said and done, defendant's scheme cost Victim #1 more than $945,000, and yet it was only possible due to the generosity and professional support Victim #1 had shown defendant. Victim #1 is a committed preservationist who owns several historically significant homes and residential buildings in the Portland metropolitan area. Victim #1 originally retained a firm called Income Property Management (IPM) to maintain and lease those properties, and defendant managed at least part of Victim #1's portfolio as an IPM employee. By late 2012, however, Victim #1 had grown dissatisfied with IPM's fee structure and approached defendant with the idea of defendant's starting an independent management company of her own. Defendant demurred at first, citing a delinquent balloon mortgage payment on her house, but Victim #1 loaned defendant the money to make the payment and set defendant up in business.

Defendant formally launched IVPMC in late January 2013. Although Victim #1 remained IVPMC's biggest client, defendant also recruited other property-owners, including at least two condominium homeowners' associations (HOAs) in Portland. Defendant's new business, in short, was growing and doing well. But not well enough. By the end of 2014, defendant had started diverting money from client accounts for her personal use by sweeping cash from the properties' trust accounts into her IVPMC operating accounts and thence to unauthorized expenditures. The wire fraud charged in the Information reflects just one such transaction: a May 4, 2018, wire transfer of $50,080.00 from a Washington-based operating account for one of Victim #1's properties (Harrison Court) to IVPMC's Key Bank account in Portland.

**Government's Sentencing Memorandum**                                    **Page 3**

Defendant started out diverting smaller amounts (as embezzlers tend to do), but events in 2015 accelerated her theft of funds. That year, Victim #1 bought a Victorian mansion that had been used primarily as a wedding venue but was at risk of demolition. Victim #1 had no interest in operating a wedding business, but defendant saw an opportunity for herself and her family. She proposed to lease the property from Victim #1 for a new enterprise, Inspire Wedding and Events (IWE), which her brother would operate. Although IWE had some early success—including winning a $50,000 cash prize in a Christmas lights contest sponsored by ABC for its "Miracle of a Million Lights" display—the business proved costlier to run than defendant and her family could manage. By the end of 2015, defendant had started diverting substantial amounts from IVPMC client accounts to meet payroll and other expenses at IWE.

To conceal these transactions, defendant created bogus bank statements for her clients' review. For instance, defendant altered the December 2015 Key Bank statement for one of the condominium HOAs to show a beginning balance of $130,969.31 rather than the actual balance of $83,265.53, thereby hiding the fact that she had already stolen nearly $50,000 from just that account by the end of November 2015. She also altered the statement to omit an unauthorized withdrawal on December 8, 2015, of nearly $18,000, and altered the ending balance on the statement to read $131,891.06 rather than the actual balance of only $66,193.28. By the time her fraud was discovered in February 2019, defendant had stolen a total of at least $136,022.31 from the HOA (Victim #2).[1]

---

[1] Victim #2 has submitted a forensic audit report by Schwindt & Co. dated September 23, 2019, reflecting total losses (including offsets) of $136,022.31, which was less than the FBI's final tally of $152,122.56 (itself less than the FBI's earlier calculation of 168,825.20, as reflected in the PSR at paragraph 113). The government recommends an order of restitution to Victim #2 of $136,022.31 based on that victim's own accounting.

**Government's Sentencing Memorandum**                                          **Page 4**

As her problems mounted over the ensuing years, defendant could no longer keep the fraud afloat just by shifting moneys among and between the various accounts for Victim #1 and Victim #2.  By the summer of 2018, she began diverting funds from her second HOA client (Victim #3).  That HOA, predominantly comprising retirees and older residents, lost at least $121,614.36 to defendant's machinations in less than a year.[2]

Although defendant spent the bulk of her ill-gotten gains propping up her businesses, it was far from the only way she spent the money.  She traveled extensively—she often dodged concerned calls from clients by claiming she was on the road—and spent at least $300,000 on personal expenses.  Those included expenditures of more than $53,000 at retail stores and personal service providers, $166,000 in investments in her children's businesses, and nearly $40,000 in untraceable cash outlays.

## II.    GUIDELINES APPLICATION AND RECOMMENDED SENTENCE

Base Offense Level, Count 1 (USSG § 2B1.1(a)(1)) ............................................ 7

Enhancement for loss exceeding $550K but less $1.5MM (§ 2B1.1(b)(1)(H)) ... 14

Adjustment for Acceptance of Responsibility (§ 3E1.1) ..................................... -3

Total Offense Level ........................................................................................ 18

Defendant's Criminal History ............................................................. I (0 points)

The foregoing Guideline calculation yields an advisory sentencing range of 27 to 33 months' imprisonment in Zone D of the Sentencing Table.  Pursuant to the parties' plea agreement, however, the

---

[2] The HOA's insurer claimed a loss of $126,855.45 (plus a $1,000 deductible borne by the HOA), but that amount did not include offsets of approximately $6,000 identified by the FBI.

Three members of Victim #3's HOA Board have submitted victim impact statements, two of them advocating a prison sentence of at least 4 years for defendant. In addition to the embezzlement amounts, the Board chair rightly emphasizes $17,000 in investigative and recovery expenses the HOA suffered and the "emotional impact" on the board members and the HOA members from defendant's betrayal.

**Government's Sentencing Memorandum**                                              **Page 5**

government moves for a two-level downward departure from the applicable Guideline range for the reasons previously identified and further recommends a downward variance of two levels to take account of the favorable "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Specifically, and as further described in defendant's own sentencing submission, the scale of the victims' losses far exceeds the extent to which defendant herself benefited materially from her crime, which (though long-running) appears to have been an aberration from defendant's otherwise honorable life of familial and civic engagement.

With the departure and variance, the low end of the Guideline range is fifteen months' imprisonment (still within Zone D). The government urges the Court to sentence defendant to serve that term in federal custody, followed by a three-year term of supervised release under the conditions recommended by the Probation Office.

In addition to incarceration, the defendant must "make restitution to the victim[s] of the offense." 18 U.S.C. § 3663A(a)(1), (c)(1)(B). Accordingly, defendant should be ordered to pay restitution of not less than $1,202,751.34 as follows: $945,114.67 to Victim #1; $136,022.31 to Victim #2; and $121,614.36 to Victim #3's insurer. The Court should order remission of these amounts forthwith.

## III.    <u>NO LESSER SENTENCE IS WARRANTED</u>

Defendant asks this Court to impose a noncustodial sentence of probation, citing five considerations specific to this case: the aberrant nature of the crime; defendant's limited risk of recidivism and extensive social support; the "devastating impact" of imprisonment on defendant's family; defendant's extensive mitigation; and the risk that defendant would contract COVID-19 in prison. None of these considerations justifies a further downward variance than the government recommends. The first two form the basis for the government's own recommendation, and the remaining three do not warrant any significant reduction in defendant's sentence. At most, they might militate for a slightly deferred surrender date.

**Government's Sentencing Memorandum**                                          **Page 6**

Although defendant makes much of the adversity her family will suffer from her imprisonment, she does not live with her husband, and all of her children are adults.  Defendant currently resides in Texas, where she assists her nineteen-year-old daughter in her athletic endeavors.  That daughter's demanding career is to be commended, but it does not render her vulnerable to any special harm of the sort that would be suffered by a disabled or very young child.  In addition, given the amount defendant owes in restitution to her victims, she cannot offer any material support to family members who are fully able to provide for themselves. *See* U.S.S.G. § 5H1.6 ("[F]amily ties and responsibilities are not ordinarily relevant in determining whether a departure [from a Guideline sentence] may be warranted.").

Defendant also emphasizes her efforts to mitigate the effects of her crimes on her victims. Specifically, she points to management fees she waived for her victims' benefit and her transfer of IWE to Victim #1.  Neither gesture constitutes meaningful mitigation.  It borders on chutzpah to suggest that defendant should be rewarded for waiving fees she purportedly earned from the victims *while defrauding them*.  It's well and good for defendant to admit to stealing money, but it gravely undermines any message of contrition when she seeks special commendation for not charging her victims for the privilege of being fleeced.  The surrender of IWE is no better.  Defendant directed the bulk of her ill-gotten gains to keeping that enterprise afloat, and nevertheless lease payments went unpaid and customers' deposits were diverted to overhead, leaving Victim #1 holding the bag for services due to those customers.  Any claim that IWE was a profitable business of significant value is, at best, ironic in these circumstances.

Finally, defendant dedicates nearly a quarter of her sentencing memorandum to the "unreasonable risk of potential COVID-19 exposure" that would accompany any term of imprisonment.  Defendant is in her forties and reports she is in "good health."  (PSR ¶ 88.)  She offers no reason to conclude she faces any meaningful risk of serious complications from COVID-19 even if she were infected.  Such generic and speculative concerns cannot justify dispensing with the sort of custodial sentences the law presumes to apply in these circumstances. *See* U.S.S.G. § 5C1.1(f) ("If the applicable guideline range is in Zone D

**Government's Sentencing Memorandum**                                                            **Page 7**

of the Sentencing Table, the minimum term *shall be satisfied by a sentence of imprisonment*." (emphasis added)).

Even if the Court were to find that the adverse impact on defendant's adult daughter and the risk of COVID-19 exposure militated against a custodial sentence, it should resolve these concerns by deferring defendant's prison term rather than dispensing with it altogether. The latter course would be an unnecessary as well as unwarranted windfall for defendant. If defendant were permitted to surrender to the Bureau of Prisons in June, defendant's daughter should have concluded her training, and COVID vaccines should be widely available to at-risk populations. The government would not oppose a surrender date in June 2021, but it opposes any longer deferment.

## IV.    **CONCLUSION**

For the foregoing reasons and pursuant to the parties' plea agreement, the government recommends a sentence of 15 months' imprisonment (starting not later than June 2021) followed by a three-year term of supervised release under the conditions recommended by the Probation Office, a restitution order for $1,202,751.34 as described above, and a mandatory fee assessment of $100.00.

Dated: November 25, 2020

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

/s/ *Ryan Wesley Bounds*

RYAN W. BOUNDS, OSB #00012
Assistant United States Attorney